**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11   ALEXANDER WARREN,                    No. C-13-04464 DMR

12            Plaintiff,                  **ORDER GRANTING IN PART AND
                                          DENYING IN PART DEFENDANT'S**
13       v.                               **MOTION FOR SUMMARY JUDGMENT**

14   GEORGE MARCUS,

15            Defendant.
     _____/
16

17        This case arises out of the December 21, 2011 shooting of Plaintiff Alexander Warren by

18   Richmond Police Officer George Marcus.  Plaintiff, who survived the shooting, filed a civil rights

19   action under 42 U.S.C. § 1983 against Defendant Marcus in his personal and official capacities

20   asserting various constitutional violations and related state law statutory and tort claims.  Before the

21   court is Defendant's motion for summary judgment.  [Docket No. 41.]  The court conducted a

22   hearing on January 22, 2015 at which the parties were represented by counsel.  For the following

23   reasons, Defendant's motion is granted in part and denied in part.

24                            **I.  Background**

25        On December 21, 2011, the Richmond Police Department ("RPD") received a call regarding

26   "second hand reports" of "a man with a gun" at the Extended Stay Inn on Garrity Way in Richmond,

27   California.  A few seconds later dispatch reported that the suspect was an "ex guest that was kicked

28   off the property," and described the suspect as a "BM [black male], teens" with an "unk[nown]

**United States District Court**

For the Northern District of California

1  name." Police officers were immediately dispatched to the scene. Several minutes after the original

2  call, dispatch reported that "PR says his crew member saw the gun."

3  After the first unit of police officers arrived on scene, an officer named Sanchez began to

4  provide updates over police radio. He radioed dispatch that the suspect, later identified as Plaintiff,

5  was a six feet tall, 200 pound black male with short hair wearing all black clothing, and that the

6  suspect was running along the south side of the Extended Stay Inn toward the neighboring Courtyard

7  Marriott Hotel ("Marriott"). Sanchez subsequently radioed that the suspect was wearing red shoes

8  and "was holding the right side of his waist band," and that a security guard saw the suspect run into

9  the Marriott.

10  Defendant Marcus was at the police station when he heard the initial report that there was a

11  man with a gun at the Extended Stay Inn. He heard subsequent reports on the radio while en route to

12  the scene, including the description of the suspect as a six feet tall 200 pound black male with short

13  hair wearing all black clothing and red shoes. According to Defendant, he heard a radio report that

14  the suspect was "reaching for the right side of his waistband," and that based on his training and

15  experience, "suspects tend to hold weapons in their waistband [sic]." (Marcus Decl. ¶¶ 6, 7.)

16  Defendant arrived on scene and parked his patrol car at the intersection of Hilltop Drive and

17  Blume Drive, at the southwest corner of the rear of the Marriott, turning off his siren but leaving his

18  emergency lights on. After working with other officers to block traffic on Blume Drive, Defendant

19  loaded his shotgun with buckshot and set up his weapon on the driver's side of his patrol car with

20  the engine and the front of the car providing cover and concealment. According to Defendant, he

21  "believed that [his] assignment was to contain an armed suspect with a handgun," and that under the

22  circumstances the shotgun was "the best tool to potentially engage a suspect." (Marcus Decl. ¶ 12.)

23  Officers Andrew Barbara and Ramon Middleton and an officer named Avila were near Defendant as

24  they monitored the scene. Barbara testified that he took cover behind the driver's side door of his

25  own patrol car and that Middleton's position was next to the passenger side of Barbara's car.

26  According to Defendant, Middleton and Barbara were 20 and 40 feet to Defendant's right,

27  respectively, and Avila was 75 feet north of Defendant with a canine in the bushes.

28

**United States District Court**
For the Northern District of California

1   Defendant had participated in trainings at the Marriott and knew the general layout of the

2   building.  From his position, he saw several exits from the hotel, including metal doors in the back

3   of the building, directly in front of him, which looked like a maintenance exit.  At some point after

4   taking his position, Defendant heard a report on the radio that the suspect was "exiting through the

5   back door."  He heard a loud noise, which he described as a "bang" or a "boom," which he

6   interpreted to be a door opening.  The officers then saw Plaintiff running or moving quickly toward

7   them and then slowing to a jog along a pathway adjacent to the hotel pool area.  Defendant looked at

8   Plaintiff and determined that he fit the suspect's description, including wearing red shoes.  Plaintiff

9   was initially unaware of the officers; however, shortly after exiting the Marriott, he realized there

10  were several police officers yelling "freeze don't move.  Get down.  Get down."

11         The parties dispute Plaintiff's actions in the approximately 15 to 20 seconds between the

12  officers first spotting Plaintiff and Defendant shooting him.  According to Plaintiff, he stopped as

13  soon as he heard the officers yelling and put his hands above his head "[s]howing [the officers] that

14  [he] wasn't a threat to them."  Although he had been holding his cell phone or cell phone charger

15  when he came out of the hotel, Plaintiff testified that his hands were empty when he put them above

16  his head and that he was "wiggling [his] fingers to show that [he] didn't have anything in [his]

17  hands."  (Warren Dep. 45, 49.)  Plaintiff then began to slowly lower himself to the ground on his

18  knees while holding his hands up.  When he was on his knees, he heard the officers continue to say

19  "get down" and thought they were asking him to move further down on the ground.  He then started

20  to lie down on his stomach, stretching his hands up and out, and once he was on his stomach he tried

21  to look toward the officers so that he could obey their commands.  According to Plaintiff, he was

22  trying to move as slowly as he could.  Plaintiff testified that he was shot while he was lying on his

23  stomach on the ground, although his chest was not on the ground as he was "moving and stretching

24  [towards the sky] to show that [he] wasn't a threat towards where [he] was hearing the voices."

25  (Warren Dep. 57.)  Plaintiff testified that he never put either one of his hands near his waist as he

26  was getting on the ground, nor did he put either hand down to steady himself as he moved from a

27  standing position to his knees and then to his stomach.  He also never put his hands down near his

28  shirt or stomach.  According to Plaintiff, his hands were always up and visible to the officers.  After

3

**United States District Court**
For the Northern District of California

1  he was shot, he heard someone say "Where's the gun?  Where's the gun?" and he responded "I don't

2  have a gun.  There is no gun.  What are you talking about?"  (Warren Dep. 71.)  Plaintiff then heard

3  someone say "Let the nigger bleed."  (Warren Dep. 71.)  The officers did not find a gun on or near

4  Plaintiff.

5       Defendant disputes Plaintiff's account, contending that Plaintiff refused to comply with the

6  officers' commands.  Defendant states that he and Officers Barbara and Middleton yelled at Plaintiff

7  to show his hands, and while Plaintiff slowed his pace to a walk, he "continued to advance" on the

8  officers.  (Marcus Decl. ¶¶ 23, 24.)  Plaintiff put his hands up but would not keep them up, and

9  Defendant saw that he had earphones in his hands.  Defendant told him to get on the ground and

10 gave continuous commands for Plaintiff to comply.  According to Defendant, "it looked like

11 [Plaintiff] was thinking about what he [was] going to do," but "he did not respond to [the officers']

12 commands."  (Marcus Decl. ¶ 26.)  Defendant also states that Plaintiff's "facial expression told

13 [Defendant] that he saw [the officers] and told [Defendant] that 'damn, I've been caught, but I am

14 not going to go easy.'"  (Marcus Decl. ¶ 27.)  Defendant testified that Plaintiff "turned and started to

15 crouch down, as if pretending like he was going to get down, and then he just made a real quick

16 furtive movement, lifted his shirt up, turned, and [Defendant] saw something shiny, and that's when

17 [Defendant] pulled the trigger."  (Marcus Dep. 66-67.)  In a declaration submitted with this motion,

18 Defendant states that Plaintiff "started to check his shirt," and suddenly "twisted his body away"

19 from Defendant, "exposing his left side and reached towards the right side of his waistband."

20 (Marcus Decl. ¶ 28.)  As Plaintiff "did this, he pulled up his shirt and [Defendant] saw him grab

21 something."  (Marcus Decl. ¶ 28.)  Defendant next saw Plaintiff "come up with something silver

22 which looked to [Defendant] like a gun from [his] training and experience," so Defendant fired at

23 him with his shotgun.  (Marcus Decl. ¶ 29.)  At the time he shot Plaintiff, Defendant had a clear and

24 unobstructed view of Plaintiff but was unable to see Plaintiff's hands.  (Marcus Dep. 73.)  Defendant

25 testified that Plaintiff never went down to his knees prior to being shot.  (Marcus Dep. 67.)  He

26 estimates that Plaintiff was 160-168 feet away when he fired.  (Marcus Dep. 42.)

27      From his position Officer Barbara could see Plaintiff's left side and part of the front of his

28 body.  He could not see the right side of his body.  Barbara saw Plaintiff lowering himself to the

**United States District Court**
For the Northern District of California

ground on his knees, describing his actions as "kind of like a one-handed pushup." (Barbara Dep. 27, 28.) After Plaintiff got on his knees, Barbara saw him going further down to the ground in a prone position with his left hand in the air. Although Barbara could not see his right hand he assumed it was touching the ground as Plaintiff lowered his body down. Barbara did not see Plaintiff throw anything to the ground nor did he ever see Plaintiff with anything in his hands during the incident. Barbara described Plaintiff's position at the moment he was shot as follows: "I believe he had his left hand forward and his right hand, I couldn't see his right hand. . . . he wasn't in an upwards position. He was still flat on the ground, but his right hand was concealed, and I could not see it."

Officer Middleton testified that Plaintiff had his left arm up where Middleton could see it, and that Middleton did not see anything in his left hand. According to Middleton, Plaintiff "kept reaching down towards his waist and grabbing his shirt area" with his right hand. (Middleton Dep. 50.) When Middleton he heard the shotgun fire, he saw Plaintiff "[m]oving his shirt up and down" with his right hand, with his left elbow bent at a 90-degree angle and his left hand about his head. (Middleton Dep. 65.)

Following the shooting, officers gave Plaintiff medical assistance. Defendant did not approach Plaintiff. Defendant denies using a racial epithet towards Plaintiff during the incident. Plaintiff was later transported to a hospital where he was treated for injuries to his chest and arm.

On December 26, 2011, RPD detectives interviewed Plaintiff at the hospital. Plaintiff was medicated at the time and does not recall anything about the interview. No counsel was present. During the interview, Plaintiff stated that he immediately put his hands up as soon as he heard the officers, and that the officers told him twice to get down on the ground. (Allen Decl. Ex. D at 11, 15.) He did not go down to the ground right away because he "didn't think it was that serious," and he already had his hands up. (Allen Decl. Ex. D at 15.) He repeatedly denied reaching to his waist or lifting his shirt, stating he followed the officers' instructions and got down on the ground. (Allen Decl. Ex. D at 11, 12, 14, 15, 16.) However, Defendant contends that Plaintiff admitted to the detectives during the interview that he "laid down and then picked his shirt up to show the officer that he did not have a gun." (Def.'s Mot. 5.) This misstates Plaintiff's account; when asked by the

detective if he lifted his shirt, he denied doing so, and said he "just was . . . lifting my arm from under my wai—fro—from under me" because he was "laying on it."  (Allen Ex. D at 11-12.)  Defendant also asserts that Plaintiff admitted at the hospital that he "could have had his hands down by his waist or his pockets to pull up his pants."  (Def.'s Mot. 5.)  It is important to note that Plaintiff made this statement after he had repeatedly denied reaching to his waist or lifting his shirt at any point during the confrontation.  (Allen Decl. Ex. D at 11, 12, 14, 15, 16.)  Late in the interview, after the detective had asked at least ten times whether Plaintiff had reached to his waist with his hands or lifted his shirt, with Plaintiff answering in the negative each time, the detective informed Plaintiff that the "hotel's video camera showed [Plaintiff] reach down to [his] waist."  (Allen Decl. Ex. D at 19.)  In response, Plaintiff stated "if this is [what] the video show[s], then that's what . . . it could've been," and that he "must have been trying to pull up [his] pants or something."[1]  (Allen Decl. Ex. D at 19.)

Plaintiff filed his complaint on September 26, 2013 against Defendant individually and in his official capacity, along with 25 Doe Defendants.  Plaintiff alleged the following causes of action: 1) Section 1983 claim for unlawful seizure, based upon the Fourth and Fourteenth Amendments to the United States Constitution; 2) Section 1983 claim for violation of due process, based upon the Fourteenth Amendment; 3) Section 1983 claim for excessive force, based upon the Fourth and Fourteenth Amendments to the United States Constitution; 4) Section 1983 equal protection claim, based upon the Fourteenth Amendment; 5) violation of California's Ralph Act, California Civil Code section 51.7; 6) state law assault; 7) state law battery; 7) intentional infliction of emotional distress; 8) violation of California's Bane Act, California Civil Code section 52.1; and 9) negligence.

## II.  Evidentiary Objections

Plaintiff's opposition relies in part on the report of his "police procedures" expert Roger Clark (the "Clark report").  Defendant objects to the entire Clark report on the grounds that Plaintiff did not disclose Clark as an expert prior to the expert disclosure deadline of November 12, 2014 or the November 25, 2014 rebuttal disclosure deadline.  According to Defendant, Plaintiff did not serve

---

[1] The record contains no videotape of Plaintiff's shooting.

1    a copy of the Clark report on Defendant prior to filing his opposition on December 18, 2014.

2    Plaintiff first served an Expert Disclosure Statement listing Clark as a retained expert on or around

3    December 22, 2014, one month after the disclosure deadlines and two weeks after the December 9,

4    2014 close of expert discovery.

5           Parties must disclose the identity of any experts they may use at trial and must provide a

6    written report to the opposing party containing information about the expert's testimony.  Fed. R.

7    Civ. P. 26(a)(2)(A), (B).  Expert disclosures must be made "at the times and in the sequence that the

8    court orders."  Fed. R. Civ. P. 26(a)(2)(D).  Federal Rule of Civil Procedure 37(c) provides that a

9    party who fails to timely disclose the identity of an expert witness and/or an expert report "is not

10   allowed to use that . . . witness to supply evidence on a motion, at a hearing, or at a trial, unless the

11   failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  On January 7, 2015, the

12   court ordered Plaintiff to submit a statement setting forth the exact dates of his expert disclosures

13   and stating why his failure to timely disclose Clark and his report was "substantially justified" or "is

14   harmless."  [Docket No. 59.]  Plaintiff timely submitted the statement, in which he confirmed that he

15   first served the Clark report on December 18, 2014 with his opposition brief and first disclosed

16   Clark as an expert in disclosures dated December 22, 2014.[2]  [Docket No. 60.]  According to

17   Plaintiff, due to limited availability of both parties' counsel, the parties agreed that Plaintiff would

18   depose Defendant on November 21, 2014, nearly two weeks after the expert disclosure deadline,

19   because that was the only date both parties were available.  However, the parties were forced to

20   reschedule Defendant's deposition at the last minute and continued the deposition to December 4,

21   2014.  Defendant's deposition transcript was available on December 13, 2014, and Plaintiff

22   forwarded the transcript to Clark shortly thereafter so that Clark could complete his report.

23   According to Plaintiff, he directed Clark to wait for Defendant's deposition transcript before

24   preparing his report to avoid the expense of requiring Clark "to write two reports reflecting his

25   opinion pre and post deposition."  Plaintiff asserts that his late disclosure is harmless and any

26

27   _____

28         [2] Defendant filed a response to Plaintiff's statement on January 14, 2015.  [Docket No. 61.]

United States District Court

For the Northern District of California

1  prejudice "easily curable" because there is sufficient time to permit Defendant to depose Clark

2  before trial.

3      The court finds that Plaintiff has not established that his late expert disclosure was

4  substantially justified or is harmless for purposes of considering the Clark report in connection with

5  this motion.  Plaintiff's sole asserted reason for his late disclosure was the desire to avoid the

6  expense of having his expert prepare two reports.  This does not constitute a "substantial

7  justification" for not disclosing his expert by the court-ordered deadlines.  Plaintiff could have asked

8  Defendant for a stipulation to extend the expert disclosure deadlines or sought relief from the court.

9  He did not, and there is no evidence that he was prevented from doing so.  The court also notes that

10  Clark's report is dated December 8, 2014, five days before Defendant's deposition transcript was

11  purportedly available.  However, Plaintiff still delayed in serving the report, only filing it with his

12  opposition on December 18, 2014.  Moreover, the late disclosure was not harmless, as Defendant

13  was unable to cross examine Clark regarding his opinions in preparation for this motion.

14  Accordingly, the court will not consider the Clark report in considering this motion.

15      However, the court finds that the prejudice to Defendant caused by Plaintiff's late disclosure

16  can be cured in time for trial.  Defendant is granted leave to depose Plaintiff's expert, but Plaintiff's

17  counsel shall pay the expert's fees for the deposition.  Defendant may also provide a rebuttal expert

18  or supplement his expert's report to address Clark's opinions.  The parties shall immediately meet

19  and confer regarding a schedule for the deposition and Defendant's disclosure of a rebuttal expert or

20  supplemental report.

21      Defendant makes a number of objections to other evidence cited in Plaintiff's brief.  The

22  court overrules all other objections or denies them as moot because the court did not rely on them in

23  reaching its decisions in this order.

24  **III.  Legal Standard**

25      A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

26  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of

27  establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

28  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

United States District Court

For the Northern District of California

1  most favorable to the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted).

2  A genuine factual issue exists if, taking into account the burdens of production and proof that would

3  be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could

4  return a verdict in that party's favor.  *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248.  The court

5  may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at

6  249.

7          To defeat summary judgment once the moving party has met its burden, the nonmoving party

8  may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

9  or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine

10  issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

11  (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a scintilla of

12  evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory

13  assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.

14  1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly

15  contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

16  version of the facts" when ruling on the motion.  *Scott*, 550 U.S. at 380.

### IV.  Discussion

**A.     Claims No Longer at Issue**

19          In his opposition, Plaintiff concedes his Fourteenth Amendment claims and dismisses them.

20  The court also dismisses the 25 Doe Defendants from this action.  There is no provision in the

21  Federal Rules of Civil Procedure permitting the use of fictitious defendants.[3]  *See Fifty Assocs. v.*

22  *Prudential Ins. Co. of Am.*, 446 F.2d 1187, 1191 (9th Cir. 1970); *see also Columbia Steel*

23  *Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's

24  grant of summary judgment in favor of non-appearing defendant).

**B.     Unlawful Seizure**

---

[3] Plaintiff does not oppose the dismissal of the Doe Defendants.

United States District Court

For the Northern District of California

Plaintiff contends that he was arrested at the moment Defendant threatened Plaintiff with deadly force; specifically, when Defendant pointed his firearm at Plaintiff.  Plaintiff argues that the seizure constituted an arrest that was not supported by probable cause and thus violated the Fourth Amendment.  Plaintiff also argues the alternative; i.e., that if the seizure was an investigative detention, rather than an arrest, Defendant did not have reasonable suspicion to detain him.  As set forth below, Defendant concedes that Plaintiff was arrested at the moment when he was shot.  Therefore, the court will first analyze whether Defendant's arrest was supported by probable cause, and then consider whether the detention occurring at an earlier point in time was supported by reasonable suspicion.

**1.      Legal Framework**

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment jurisprudence.  *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing *Terry*).  "The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment."  *Erwin*, 803 F.2d at 1508.

"The second tier consists of limited intrusions such as pat-downs of the outer clothing (or 'frisks') and brief investigative detentions.  To justify these 'limited' searches and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one."  *Id.*  During a so-called *Terry* stop, police officers are entitled to employ reasonable measures to protect themselves and others in potentially dangerous situations.  *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995).  However, "[i]nvestigative stops based upon suspicion short of probable cause are . . . constitutionally permissible only where the means utilized are the least intrusive reasonably available."  *Kraus v. Pierce Cnty.*, 793 F.2d 1105, 1108 (9th Cir. 1986).  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative

United States District Court
For the Northern District of California

1  methods employed should be the least intrusive means reasonably available to verify or dispel the

2  officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

3      "The third tier comprises 'full scale' searches or arrests requiring probable cause." *Erwin*,

4  803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest

5  occurs and probable cause is required."). To determine whether a seizure has ripened into a

6  full-scale arrest, the court must consider the "totality of the circumstances." *United States v. Del*

7  *Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (quoting *United States v. Baron*, 860 F.2d 911, 914 (9th Cir.

8  1988), *cert. denied*, 490 U.S. 1040 (1989)). No one factor is dispositive when evaluating the totality

9  of the circumstances, which includes "the extent that freedom of movement is curtailed and the

10 degree and type of force or authority used to effectuate the stop." *Kraus*, 793 F.2d at 1109 (citation

11 omitted); *see also Del Vizo*, 918 F.2d at 824. "This is a highly fact-specific inquiry that considers

12 the intrusiveness of the methods used in light of whether these methods were 'reasonable *given the*

13 *specific circumstances*.'" *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir.

14 2014) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)) (noting that "because

15 this inquiry is fact specific, it is often left to the determination of a jury"). The proper focus in

16 determining whether the coerciveness or restraint used in a stop is sufficient to constitute an arrest is

17 viewed from the perspective of the person seized, not from the perspective of the officers. *City of*

18 *Portland*, 73 F.3d at 235 (citation omitted). The test is whether "a reasonable innocent person in

19 these circumstances would not have felt free to leave after brief questioning," *id.*, "i.e., that

20 indefinite custodial detention is inevitable." *United States v. Guzman-Padilla*, 573 F.3d 865, 884

21 (9th Cir. 2009) (citing *Kraus*, 793 F.2d at 1109 ("where force is used such that the innocent person

22 could reasonably have believed he was not free to go and that he was being taken into custody

23 indefinitely, an arrest has occurred." (citation omitted))).

24      Aggressive police conduct will not necessarily be deemed an arrest when it is in response to

25 legitimate officer safety concerns. *Stevens v. Rose*, 298 F.3d 880, 883-84 (9th Cir. 2002) (citing

26 *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)). The Ninth Circuit has held that "while

27 there are no bright-line rules, . . . the use of especially intrusive means of effecting a stop" is only

28 allowed in "special circumstances, such as 1) where the suspect is uncooperative or takes action at

**United States District Court**

For the Northern District of California

the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime; and 4) where the police have information that a crime that may involve violence is about to occur." *Green*, 751 F.3d at 1047 (citing *Washington*, 98 F.3d at 1189) (quotation marks omitted).

### 2.  Whether Plaintiff's Arrest Was Supported by Probable Cause

Plaintiff claims that he was arrested at the moment Defendant pointed his firearm at Plaintiff and threatened him with deadly force.  While Defendant does not endorse or adopt Plaintiff's position about the moment at which the detention ripened into an arrest, counsel conceded at the hearing that the detention became an arrest once Defendant shot Plaintiff.  Therefore, since Defendant concedes that an arrest took place, the court must consider whether Defendant had probable cause to arrest Plaintiff.

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)).  Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Id.* (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964)).  "Alternatively, this court has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *Id.* (citing *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986); *Celis*, 33 Cal. 4th at 673 ("Probable cause exists when the facts known to the arresting officer would persuade someone of 'reasonable caution' that the person to be arrested has committed a crime." (citation omitted)).  While conclusive evidence of guilt is not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)).  "Probable cause is lacking if the circumstances relied on are susceptible to a variety of credible interpretations not necessarily compatible with nefarious activities." *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994) (citations omitted).

United States District Court

For the Northern District of California

Probable cause must be determined at the time the arrest is made.  Facts learned or evidence obtained as a result of a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made.  *City of Portland*, 73 F.3d at 236 (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)).  "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738 F.2d at 1008).

Defendant contends that probable cause existed to arrest Plaintiff for violation of California Penal Code § 148(a)(1).  Section 148(a)(1) provides that a person "who willfully resists, delays, or obstructs any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . shall be [guilty of a misdemeanor]."  Cal. Penal Code § 148(a)(1).[4]  While Section 148(a)(1) is "often referred to as a statute prohibiting 'resisting arrest'. . . the statutory prohibition is much broader than merely resisting arrest."  *Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir. 2011).  The California Supreme Court has held that "a conviction under § 148(a)(1) requires only that some lawful police conduct was resisted, delayed, or obstructed" during a single continuous chain of events.  *Id.* at 1131 (citing *Yount v. City of Sacramento*, 43 Cal. 4th 885 (2008)).

Defendant argues that probable cause existed for Plaintiff's arrest for violation of section 148(a)(1) because he did not obey the officers' commands to put up his hands and lie down on the ground and instead began to turn away from the officers, reaching for a shiny object which Defendant believed was a gun.  In support, Defendant cites Plaintiff's statements during his interview in the hospital soon after the shooting, including the statement that Plaintiff did not go down to the ground when the officers first ordered him to and that he could have had his hands down by his waist or his pockets to pull up his pants.  Notably, Defendant does not address Plaintiff's

---

[4] The elements of the crime of violating section 148(a)(1) are: "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties."  *Yount v. City of Sacramento*, 43 Cal. 4th 885, 894-95 (2008) (citation and quotation marks omitted).

sworn deposition testimony in which he contradicted those prior statements and testified that he followed all of the officers' commands by immediately putting his hands up and moving to lie flat on the ground.  The court finds that the circumstances of the hospital interview could lead a reasonable jury to discount or disregard Plaintiff's statements made during that interview.  Specifically, a reasonable jury could conclude that Plaintiff was incompetent or impaired during the interview and that the detectives led him into making statements that would help exonerate Defendant from an excessive force claim.  In particular, the court notes that the detectives proceeded with the interview despite Plaintiff being heavily medicated and repeatedly asked Plaintiff whether he had moved his hands toward his waist or shirt despite his consistent denials, finally eliciting a different answer when they informed him of the existence of a videotape that purportedly showed him moving his hands to his waist.  Additionally, Defendant does not address Officer Barbara's testimony that Plaintiff had lowered himself to the ground and was "flat on the ground" when Defendant shot him.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant lacked probable cause to arrest Plaintiff for "willfully resist[ing], delay[ing], or obstruct[ing]" Defendant during the confrontation at the Marriott.  *See Loharsingh v. City & Cnty. of San Francisco*, 696 F. Supp. 2d 1080, 1100 (N.D. Cal. 2010) (denying summary judgment on false imprisonment claim based on arrest for violation of section 148(a)(1) where the plaintiff asserted he immediately complied with officers' orders to raise his hands and exited vehicle as instructed); *see also People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1993) ("it surely cannot be supposed that Penal Code section 148 criminalizes a person's failure to respond with alacrity to police orders.").  Accordingly, given the genuine dispute of material fact regarding Plaintiff's actions prior to the shooting, summary judgment on the question of whether the arrest was supported by probable cause is not warranted.  *See Harper*, 533 F.3d at 1022.

### 3. Qualified Immunity

Defendant also moves for summary judgment on Plaintiff's wrongful arrest claim on the grounds that he is entitled to qualified immunity.

**United States District Court**

For the Northern District of California

1    The doctrine of qualified immunity protects government officials "from liability for civil

2 damages insofar as their conduct does not violate clearly established statutory or constitutional

3 rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

4 (1982). The analysis involves two inquiries. First, taken in the light most favorable to plaintiff, the

5 court must ask whether the facts alleged show that the officer's conduct violated a constitutional

6 right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not

7 inquire further before ruling that the officer is entitled to qualified immunity. *Id*. If, however, "a

8 violation could be made out on a favorable view of the parties' submissions," the court must

9 examine "whether the [constitutional] right was clearly established."[5] *Id*. "The relevant, *dispositive*

10 *inquiry* in determining whether a right is clearly established is whether it would be clear to a

11 reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v.*

12 *Haugen*, 543 U.S. 194, 198-99 (2004) (emphasis added) (internal quotation marks omitted) (citing

13 *Saucier*, 533 U.S. at 202). If the law did not put the officer on notice that his conduct would be

14 clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S.

15 at 202.

16    The Ninth Circuit has made clear that "when [qualified immunity] depends on genuinely

17 disputed issues of material fact, the court must submit the fact-related issues to the jury." *Ortega v.*

18 *O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *see also Torres v. City of Los Angeles*, 548 F.3d

19 1197, 1211 (9th Cir. 2008) (noting that where "historical facts material to the qualified immunity

20 determination are in dispute," a jury must decide those facts). "The determination of whether a

21 reasonable officer could have believed his conduct was lawful is a determination of law that can be

22 decided on summary judgment only if the material facts are undisputed." *LaLonde v. Cnty. of*

23 *Riverside*, 204 F.3d 947, 953 (citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)).

24    Here, given the dispute of fact regarding Plaintiff's actions immediately before he was shot

25 and arrested, qualified immunity on Plaintiff's wrongful arrest claim is denied.

26

27    [5] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that a court has the

28 discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

1    **4.      Whether Plaintiff's Detention Was Supported by Reasonable Suspicion**

2          Plaintiff also contends that he was detained at the moment Defendant pointed his firearm at

3    Plaintiff, and argues that Defendant lacked reasonable suspicion to detain him.

4          An investigatory or *Terry* stop is reasonable under the Fourth Amendment if "the officer's

5    action was justified at its inception" and the investigation "was reasonably related in scope to the

6    circumstances which justified the interference in the first place." *United States v. Sharpe*, 470 U.S.

7    675, 682 (1985) (quoting *Terry*, 392 U.S. at 20); *see also Royer*, 460 U.S. at 498 ("*Terry* created a

8    limited exception to th[e] general rule" that police detentions require probable cause, wherein

9    "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a

10   person has committed or is about to commit a crime.").  An officer's action is justified at its

11   inception if the officer had "reasonable suspicion" of criminal activity before initiating an

12   investigatory stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Reasonable suspicion means the

13   officer must be able to identify "specific and articulable facts which, taken together with rational

14   inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; *see also*

15   *United States v. Cortez*, 449 U.S. 411, 417 (1981) (holding that "the totality of the circumstances –

16   the whole picture – must be taken into account" when determining if an officer had reasonable

17   suspicion to perform an investigatory stop).  The reasonable suspicion standard "'is a less

18   demanding standard than probable cause,' and merely requires 'a minimal level of objective

19   justification.'" *Gallegos*, 308 F.3d at 990 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

20   When detaining a person under *Terry*, a police officer is entitled to conduct a limited investigation to

21   determine if the person was involved in criminal activity.  *See United States v. Hensley*, 469 U.S.

22   221, 229 (1985); *Royer*, 460 U.S. at 498; *Terry*, 392 U.S. at 30.

23         Defendant argues that reasonable suspicion existed to support his detention of Plaintiff based

24   on the following facts: Defendant heard the report of a man with a gun at the Extended Stay Inn and

25   subsequent broadcasts that described the suspect as an African American man approximately six feet

26   tall, weighing 200 pounds with short hair wearing all black clothing and red shoes.  He also heard

27   that the suspect was running toward the Marriott and was holding his waistband.  After arriving on

28   the scene and taking his position with the other officers, Defendant heard a report that the suspect

**United States District Court**
For the Northern District of California

1   was exiting through the back door of the Marriott.  After hearing what he believed was the sound of

2   the door opening, he saw Plaintiff moving quickly toward him and determined that Plaintiff matched

3   the description of the suspect.

4         Plaintiff does not dispute any of the facts underlying reasonable suspicion, including the fact

5   that he matched the description of the suspect with a gun.  Instead, he asserts that reasonable

6   suspicion did not exist to support his detention because the RPD officers were acting on an

7   unverified tip that a man had been seen with a gun.  According to Plaintiff, it was unreasonable for

8   the officers to rely on the tip to detain Plaintiff without first corroborating the report, citing *Jones v.*

9   *United States*, 362 U.S. 257, 269 (1960), *overruled on other grounds*, *United States v. Salvucci*, 448

10   U.S. 83 (1980).  However, the Court in *Jones* addressed the validity of a search warrant based solely

11   on an affidavit that rested solely on hearsay.  The Court held that for purposes of a search warrant,

12   an officer "may rely on information received through an informant, rather than upon his direct

13   observations, so long as the informant's statement is reasonably corroborated by other matters

14   within the officer's knowledge." *Jones*, 362 U.S. at 269 (citation omitted).  The Court did not

15   address the circumstances under which police may rely on a tip when performing an investigative

16   stop, nor did it hold that police have an obligation to corroborate tips before acting on them.

17         More recently, in *Navarette v. California*, 134 S. Ct. 1683 (2014), the Court squarely

18   addressed the question of when police may conduct investigative stops based on information from

19   anonymous tips, noting that "[w]e have firmly rejected the argument 'that reasonable cause for a[n

20   investigative stop] can only be based on the officer's personal observation, rather than on

21   information supplied by another person.'" *Id*. at 1688 (citation omitted).  The Court reiterated that

22   "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability

23   to provide reasonable suspicion to make [an] investigatory stop.'" *Id*. (citation omitted).  In

24   *Navarette*, a 911 caller, whom the Court assumed was anonymous, reported that a truck ran the

25   caller off the road. *Id*.  After receiving the tip, "which included the nature of the incident and the

26   location and a specific description of the offending vehicle," officers pulled the vehicle over and

27   found 30 pounds of marijuana in the truck. *United States v. Edwards*, 761 F.3d 977, 984 (9th Cir.

28   2014) (citing *Navarette*, 132 S. Ct. at 1686-87).  The drivers of the truck moved to suppress the

1    evidence on the grounds that "the traffic stop violated the Fourth Amendment because the officer

2    lacked reasonable suspicion of criminal activity." *Navarette*, 132 S. Ct. at 1687.  The Court held

3    that the 911 call provided reasonable suspicion to justify the stop based on four points: 1) the

4    tipster's eyewitness knowledge of the events reported—dangerous driving—"len[t] significant

5    support to the tip's reliability," *id.* at 1689, along with the facts that 2) "the caller made a statement

6    about an event 'soon after perceiving the event,' which is 'especially trustworthy'; 3) the caller used

7    911, which 'has some features that allow for identifying and tracing calls, and thus provide some

8    safeguards against making false reports with immunity'; and 4) the caller created reasonable

9    suspicion of an ongoing and dangerous crime . . . rather than 'an isolated episode of past

10   recklessness.'" *Edwards*, 761 F.3d at 984 (citing *Navarette*, 132 S. Ct. at 1689-90); *compare*

11   *Florida v. J.L.*, 529 U.S. 266, 268 (2000) (no reasonable suspicion arose from "bare-bones tip that a

12   young black male in a plaid shirt standing at a bus stop was carrying a gun"; "tipster did not explain

13   how he knew about the gun" and there was no indication that the tip was made contemporaneously

14   with observation of criminal activity or under stress of excitement caused by startling event).

15        Here, the court finds that the call leading to Plaintiff's detention "exhibited sufficient indicia

16   of reliability" to provide Defendant with reasonable suspicion to detain Plaintiff to determine if he

17   was the suspect.  Three circumstances support this conclusion.  First, the call detail notes indicate

18   "second hand reports of a man with a gun on the property."  Although the call detail notes do not

19   indicate whether the report came through 911 or the caller contacted RPD some other way, the

20   person who supplied the caller with the information was not anonymous.  The notes indicate the

21   information came from "a Dennis with the construction company on site," and provide a phone

22   number.  *See United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (call that is not

23   anonymous is "entitled to greater reliability"); *see also Navarette*, 134 S. Ct. at 1690 ("a reasonable

24   officer could conclude that a false tipster would think twice before using" a system that could

25   identify and trace callers).  Second, the call was made soon after the witness saw (or believed he

26   saw) the suspect with a gun, and was almost immediately followed by additional reports providing

27   the suspect's description.  Third, the report was of an ongoing and potentially dangerous emergency,

28   a man with a gun on the hotel property, "rather than an isolated episode of past recklessness."  *Id.* at

1690.  The court finds that these circumstances, taken together, provide sufficient indicia that the

call to RPD was reliable.

   In addition to the initial report of a man with a gun, Defendant received subsequent reports

providing a specific physical description of the suspect that Plaintiff matched exactly, as well as a

report that he was seen holding his waistband and information tracking his movements between the

two hotels.  Looking at the totality of the circumstances, and viewing the facts in the light most

favorable to Plaintiff, the court finds that the undisputed facts establish that "specific and articulable

facts" gave rise to Defendant's reasonable suspicion that Plaintiff was the suspect with a gun.

Accordingly, the court grants summary judgment on Plaintiff's claim that his detention was not

supported by reasonable suspicion.

**B.**  **Excessive Force**

   Defendant next moves for summary judgment on Plaintiff's excessive force claim on the

grounds that the force used was reasonable.  In the alternative, Defendant argues that he is entitled to

qualified immunity.

   A claim of excessive force in the context of an arrest or investigatory stop implicates the

Fourth Amendment right to be free from "unreasonable . . . seizures."  U.S. Const. amend. IV; *see*

*Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Determining whether the force used to effect a

particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the

countervailing governmental interests at stake."  *Id*. at 396 (citations and internal quotation marks

omitted).  Because the reasonableness standard is not capable of precise definition or mechanical

application, "its proper application requires careful attention to the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate

threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting

to evade arrest by flight."  *Id*.  The "most important single element" is whether there is an immediate

threat to safety.  *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew*

*v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).  Courts also consider the "'quantum of force' used to

arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and

United States District Court

For the Northern District of California

1  the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010)

2  (internal citations omitted).

3      The reasonableness inquiry in excessive force cases is an objective one: whether the officer's

4  actions are objectively reasonable in light of the facts and circumstances confronting him, without

5  regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*,

6  490 U.S. at 396.  "[T]he reasonableness of force used is ordinarily a question of fact for the jury."

7  *Liston*, 120 F.3d at 976 n.10.  "Because the excessive force inquiry nearly always requires a jury to

8  sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has]

9  held on many occasions that summary judgment or judgment as a matter of law in excessive force

10  cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012)

11  (internal quotations and citations omitted).

12      Defendant argues that he faced a life-threatening danger to his safety and to the safety of the

13  civilians in the vicinity of the Marriott, and that his use of deadly force on Plaintiff was thus

14  objectively reasonable.  However, as discussed above, the parties dispute Plaintiff's actions leading

15  up to the shooting, precluding summary judgment on Plaintiff's excessive force claim.  According to

16  Defendant, Plaintiff did not comply with the officers' commands, refused to keep his hands up, and

17  never went down to his knees.  Defendant asserts that Plaintiff instead started to crouch, as if

18  pretending to get down, then lifted his shirt and twisted away from Defendant while reaching for his

19  waistband, grabbing something that looked like a gun.  Plaintiff flatly disputes this.  According to

20  Plaintiff, he complied with the officers' orders as soon as he heard them yelling, putting his hands

21  above his head and wiggling his fingers to show that his hands were empty.  He then lowered

22  himself to his knees and moved onto his stomach, stretching his hands up and out.  Plaintiff denies

23  reaching toward his waist, shirt, or stomach at any time during the confrontation, and asserts that his

24  hands were always up and visible to the officers.  The parties' competing accounts are each

25  corroborated in part by Officers Barbara and Middleton.  Barbara testified that he saw Plaintiff get

26  on his knees and then move to a prone position with his left hand forward and up, and stated that

27  Plaintiff was shot when he was "still flat on the ground."  However, Middleton testified that Plaintiff

28  kept reaching down toward his waist and grabbing his shirt area.

United States District Court

For the Northern District of California

1  The reasonableness inquiry is whether Defendant's actions were objectively reasonable in

2  light of the circumstances confronting him. *See Graham*, 490 U.S. at 396.  Given the disputes of

3  fact about those circumstances, i.e. Plaintiff's actions, summary judgment as to his excessive force

4  claim must be denied.  *See Avina*, 681 F.3d at 1130 (noting that summary judgment in excessive

5  force cases should be granted sparingly, as "the excessive force inquiry nearly always requires a jury

6  to sift through disputed factual contentions, and to draw inferences therefrom").  The same issues of

7  material fact also preclude a finding that Defendant is entitled to qualified immunity on the

8  excessive force claim.  *See Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998); *Torres*, 548

9  F.3d at 1210-11.

10  **C.    California Civil Code section 51.7**

11  California Civil Code section 51.7, the Ralph Act, provides that "[a]ll persons within

12  [California] have the right to be free from any violence, or intimidation by threat of violence,

13  committed against their persons or property" because of race.[6]  Cal. Civ. Code §§ 51.7(a), 51(b).  In

14  order to establish a section 51.7 claim, a plaintiff must show "(1) the defendant threatened or

15  committed violent acts against the plaintiff; (2) the defendant was motivated by his perception of

16  plaintiff's race; (3) the plaintiff was harmed; and (4) the defendant's conduct was a substantial factor

17  in causing the plaintiff's harm." *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1167 (N.D. Cal.

18  2009) (citation omitted).

19  Defendant moves for summary judgment on Plaintiff's section 51.7 claim on the grounds that

20  there is no evidence that his actions were motivated by Plaintiff's race.  Plaintiff testified that after

21  he was shot, he heard someone use a racial epithet.  However, Defendant states that he did not

22  approach Plaintiff following the shooting and denies using a racial epithet.  Plaintiff does not dispute

23  Defendant's statement, and offers no evidence of his own to tie the statement to Defendant, such as

24  evidence that Plaintiff was able to hear Defendant despite the distance between the two, or that he

25  recognized Defendant's voice.  Instead, Plaintiff argues that the epithet "is indicative of a culture of

26

27  _____

[6] The Ralph Act also protects individuals based on sex, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, and sexual orientation. *See* Cal. Civ.

28  Code §§ 51.7(a), 51(b).

United States District Court

For the Northern District of California

1 racial animus" within RPD.  (Pl.'s Opp'n 17.)  While such a statement, if made, would be despicable

2 as well as constitute strong evidence of racial animus, Defendant denies being near Plaintiff after the

3 shooting and denies making the statement.  Plaintiff provides no authority to support attributing the

4 epithet by an unidentified officer to Defendant for purposes of section 51.7 liability.  Plaintiff has

5 failed to demonstrate a genuine dispute of fact as to whether Defendant was motivated by racial

6 animus when he shot Plaintiff.  Accordingly, the court grants summary judgment as to Plaintiff's

7 section 51.7 claim.

8 **D.      Assault & Battery**

9       Plaintiff's third cause of action is for assault and battery against Defendant based on the

10 shooting.  (Compl. ¶¶ 24-26.)  Defendant moves for summary judgment on the battery claim only.

11 The law governing a state law claim for battery is the same as that used to analyze a claim for

12 excessive force under the Fourth Amendment.  *See Sorgen v. City and Cnty. of San Francisco*, No. C

13 05-03172 TEH, 2006 WL 2583683, at *9 (N.D. Cal. Sept. 7, 2006) (citing *Edson v. City of Anaheim*,

14 63 Cal. App. 4th 1269, 1274-75 (1998)).  For the same reasons discussed above with respect to

15 Plaintiff's excessive force claim, the court denies summary judgment as to his battery claim.

16       At the hearing, Plaintiff clarified that he does bring a separate claim for assault, although his

17 third cause of action is pleaded as "assault and battery."  "'[A]ssault' and 'battery' are two distinct

18 civil claims with different elements."  *Davis v. City of San Jose*, ---F. Supp. 3d---,---, No. C 14-

19 02035 BLF, 2014 WL 4772668, at *7 n.7 (N.D. Cal. Sept. 24, 2014) (citing *Yun Hee So v. Shin*, 212

20 Cal. App. 4th 652, 668-69 (2013)).  The elements of a cause of action for assault are "(1) defendant

21 acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful

22 or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or

23 offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the

24 threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5)

25 defendant's conduct was a substantial factor in causing plaintiff's harm."  *Yun Hee So*, 212 Cal.

26 App. 4th at 668-69.  Given the disputes of fact regarding the reasonableness of Defendant's use of

27 force, summary judgment on this claim, had Defendant so moved, would also be inappropriate.

28 **E.      Intentional Infliction of Emotional Distress**

United States District Court

For the Northern District of California

In order to establish a claim for intentional infliction of emotional distress, Plaintiff must show "(1) extreme and outrageous conduct by [Defendant] with the intention of causing, or reckless disregard of the probability of causing, emotional distress"; (2) that Plaintiff "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [Defendant's] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id*. at 1051 (citations and quotation marks omitted). Behavior "may be considered outrageous if a defendant . . . abuses a relation or position which gives him power to damage the plaintiff's interest." *Cole v. Fair Oaks Fire Dept*., 43 Cal. 3d 148, 155 n.7 (1987). Defendant moves for summary judgment on Plaintiff's intentional infliction of emotional distress claim on two grounds: (1) Defendant is immune pursuant to California Government Code section 821.6, and (2) Plaintiff cannot establish Defendant acted with intent to cause Plaintiff emotional distress.

### 1.     California Government Code Section 821.6

Section 821.6 provides: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov. Code § 821.6. "The provision's principal function is to provide relief from malicious prosecution." *Blankenhorn v. City of Orange*, 485 F.3d 463, 487-88 (9th Cir. 2007) (citing *Kayfetz v. Cal.*, 156 Cal. App. 3d 491, 497 (1984)). "The statute also 'extends to actions taken in preparation for formal proceedings,' including actions 'incidental to the investigation of crimes.'" *Id*. at 488 (citing *Amylou R. v. Cnty. of Riverside*, 28 Cal. App. 4th 1205, 1209-10 (1994)). "Even so, section 821.6, as it applies to police conduct, is limited to actions taken in the course or as a consequence of an investigation." *Id.*

Defendant's conduct at issue in this case–alleged excessive force and unlawful seizure–is "not the sort of conduct to which section 821.6 immunity has been held to apply." *Blankenhorn*, 485 F.3d at 488. In *Blankenhorn*, the Ninth Circuit held that section 821.6 immunity did not apply to officers who were accused of using excessive force while arresting plaintiff "[b]ecause [the plaintiff's] assault and battery, negligence, and intentional infliction of emotional distress claims

United States District Court

For the Northern District of California

[were] based on acts that allegedly happened during his arrest, not pursuant to an investigation into his guilt." *Id.* at 488; *see also Robinson v. Solano Cnty.*, 278 F.3d 1007, 1009-11, 1016 (9th Cir. 2002) (reversing district court's grant of summary judgment on state law negligence claim arising from police officer pointing gun at head of unarmed plaintiff believed to have shot livestock-killing dogs; "California denies immunity to police officers who use excessive force in arresting a suspect . . . . Public employees are similarly not entitled to immunity in suits for false arrest or false imprisonment.").  None of the cases cited by Defendant apply section 821.6 immunity to emotional distress claims premised upon the conduct of police officers in the course of the use of force during a wrongful detention or arrest.  Instead, each case involves investigative acts of state agents during investigations conducted separate from an arrest or the decision to arrest.  *See Amylou R. v. Cnty. of Riverside*, 28 Cal. App. 4th 1205, 1208-11 (1994) (applying section 821.6 immunity to officers who took rape and attempted murder victim against her will to the crime scene and later told neighbors that she was lying about what happened); *Baughman v. Cal.*, 38 Cal. App. 4th 182, 191-93 (1995) (applying section 821.6 immunity to officers who destroyed floppy disks while executing search warrant at a computer lab during investigation of computer equipment theft); *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1050 (2007) (police officers immune from liability for defamation and intentional infliction of emotional distress based on public statements made in the course of criminal investigation).  Accordingly, the court finds that section 821.6 immunity does not shield Defendant from liability for Plaintiff's intentional infliction of emotional distress claim.  *See Bui v. City & Cnty. of San Francisco*, No. C 11-4189 LB, --- F. Supp. 2d ---,---, 2014 WL 3725843, at *17 (N.D. Cal. 2014) (holding section 821.6 does not immunize officers from wrongful death claim).

### 2. Intent to Cause Emotional Distress

Defendant next argues that Plaintiff's emotional distress claim fails because there is no evidence that Defendant acted with the intent to cause, or reckless disregard of the probability of causing, Plaintiff's emotional distress.  However, because there are triable issues of fact as to Plaintiff's actions in the moments leading up to the shooting, there is a genuine dispute about whether Defendant's conduct was extreme and outrageous and undertaken with the intent of causing Plaintiff emotional distress.  *See Blankenhorn*, 485 F.3d at 487 n.17 (reversing grant of summary

United States District Court

For the Northern District of California

1    judgment on intentional infliction of emotional distress claim premised on alleged use of excessive

2    force where there were disputes of fact regarding whether the use of force was lawful).  Therefore,

3    the court denies summary judgment as to Plaintiff's intentional infliction of emotional distress

4    claim.

5    **F.      California Civil Code section 52.1**

6          Defendant moves for summary judgment on Plaintiff's California Civil Code section 52.1

7    claim.  California Civil Code section 52.1, the Bane Act, gives rise to a claim where "a person or

8    persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or

9    attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any

10   individual or individuals of rights secured by the Constitution or laws of the United States, or of the

11   rights secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(a).  Plaintiff's Bane

12   Act claim is based upon his unlawful seizure and excessive force claims.

13         Defendant moves for summary judgment on Plaintiff's Bane Act claim solely on the grounds

14   that the underlying claims lack merit.  *See Reynolds v. Cnty. of San Diego*, 84 F.3d 1162, 1170-71

15   (9th Cir. 1996) ("because there is no federal constitutional violation and no conduct specified which

16   constitutes a state constitutional violation, there is no conduct upon which to base a claim for

17   liability under 52.1.").  As the court denies summary judgment on the underlying claims, summary

18   judgment on Plaintiffs' Bane Act claim is denied.

19   **G.      Negligence**

20         Defendant moves for summary judgment on Plaintiff's negligence claim based on the use of

21   force.  In order to establish a negligence claim, Plaintiff must establish "(1) a legal duty to use due

22   care; (2) a breach of that duty; and (3) injury that was proximately caused by the breach."  *Knapps*,

23   647 F. Supp. 2d at 1164 (citing *Ladd v. Cnty. of San Mateo*, 12 Cal.4th 913, 917 (1996)).  Under

24   California law, "police officers have a duty not to use excessive force."  *Id*. (citing *Munoz v. City of*

25

26

27

28

United States District Court

For the Northern District of California

1  *Union City*, 120 Cal. App. 4th 1077, 1101 (2004)).  As the court denies summary judgment on the

2  underlying claims, summary judgment on Plaintiff's negligence claim is denied.[7]

3       At the hearing, Plaintiff asserted his negligence claim is also based upon Defendant's alleged

4  unlawful seizure.  (*See* Compl. ¶ 36 (Defendant had a duty of care to avoid causing harm "through

5  their use of force and making of arrests").)  Plaintiff did not clarify the scope of this claim in his

6  opposition to Defendant's motion, instead primarily focusing on excessive force.  However, his

7  opposition states "Mr. Warren has repeatedly shown that Defendants' behavior violated his Fourth

8  Amendment rights to be free from unreasonable seizures, including use of excessive force when he

9  was shot by Defendant Marcus."  (Pl.'s Opp'n 20.)  While Plaintiff's opposition is far from a model

10  of clarity, the court finds that this statement, along with Plaintiff's complaint, were adequate to put

11  Defendant on notice that his negligence claim rested partly on the unlawful detention claim.  The

12  court denies Defendant's request to deem this claim waived.

13  **H.  Punitive Damages**

14       Finally, Plaintiff seeks punitive damages from Defendant.  Defendant argues first that the

15  request for punitive damages against Defendant in his official capacity must be dismissed because

16  suing an individual in his or her official capacity is equivalent to suing the public entity itself, *see*

17  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), and the City of Richmond is immune from punitive

18  damages under federal and state law.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271

19  (1981) (holding municipalities are immune from punitive damages under 42 U.S.C. § 1983); Cal.

20  Gov't Code § 818 (public entities not liable for punitive damages).  Plaintiff does not respond to this

21  argument.  The court dismisses Plaintiff's punitive damages claim against Defendant in his official

22  capacity.

23       As to punitive damages against Defendant in his individual capacity, Defendant argues that

24  there is no evidentiary basis for punitive damages under federal or state law.  A jury may assess

---

26

27

28

    [7] The court notes that Plaintiff alleges that the City of Richmond "is vicariously liable to Plaintiff" for his injuries and damages caused by Defendant's negligence pursuant to California Government Code section 815.2(a).  (*See* Compl. ¶ 36.)  However, Plaintiff did not name the City of Richmond as a defendant and did not move to substitute the Doe Defendants with any parties.  As noted above, the court dismisses the Doe Defendants.

**United States District Court**
For the Northern District of California

punitive damages under Section 1983 when a defendant's conduct involves "reckless or callous indifference to the federally protected rights of others" without regard to actual intent or malice. *Smith v. Wade*, 461 F.2d 30, 56 (1983). Under California law, punitive damages are available if a plaintiff proves "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). Malice "includes the willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). Given that Plaintiff has raised a triable issue as to the reasonableness of force used by Defendant, the court finds that the evidence is sufficient to create a triable issue as to Defendant's state of mind during the incident in question. *See Kyles v. Baker*, ---F. Supp. 3d---,---, No. 13-cv-04695-WHO, 2014 WL 5524256, at *21 (N.D. Cal. Oct. 31, 2014) (denying summary judgment on punitive damages claim where court concluded that whether officers' use of force was reasonable was jury question). Defendant is not entitled to summary judgment on the issue of punitive damages against him in his individual capacity.

## V. Conclusion

For the foregoing reasons, summary judgment is granted on Plaintiff's claim that his detention was not supported by reasonable suspicion and his California Civil Code section 51.7 claim. The court dismisses Plaintiff's claim for punitive damages against Defendant in his official capacity and all claims against the Doe Defendants. In all other respects Defendant's motion is denied.

IT IS SO ORDERED.

Dated: January 29, 2015



DONNA M. RYU
United States Magistrate Judge